770 So.2d 482 (2000)
STATE of Louisiana
v.
Stuart Henry FREEMAN, Jr.
No. 00-238.
Court of Appeal of Louisiana, Third Circuit.
October 11, 2000.
*484 M. Bofill Duhe', Assistant District Attorney, New Iberia, LA, Counsel for the State.
Kathy Flynn Simino, Manasseh, Hildum & Gill, Baton Rouge, LA, Counsel for Defendant.
(Court composed of HENRY L. YELVERTON, SYLVIA R. COOKS, and MICHAEL G. SULLIVAN, Judges.)
SULLIVAN, Judge.
On July 14, 1999, Stuart Freeman was convicted of two counts of armed robbery, violations of La.R.S. 14:64. Thereafter, in a separate proceeding, the State filed a bill of information, alleging Defendant to be a habitual offender. Defendant admitted to having a previous felony conviction and was adjudicated as a second-offense habitual offender on each count of armed robbery. On August 31, 1999, Defendant was sentenced on each count to 198 years without benefit of parole, probation, or suspension of sentence; the sentences to run concurrent with each other.
Defendant filed a motion to reconsider his sentence which the trial court denied without a hearing on September 9, 1999. Defendant appeals, assigning six errors. For the following reasons, we affirm.

FACTS
On June 25, 1998, Elizabeth Frith was robbed as she was counting money in the office of the Delchamps grocery store in New Iberia, Louisiana. Ms. Frith heard a knock at the door, looked up, and saw Defendant with a gun. Defendant demanded that Ms. Frith unlock the door to let him in and that she fill a bag with money. She complied with his demands. Defendant's weapon had a laser sight on it which he kept aimed at her throughout the robbery. Defendant then ordered Ms. Frith to lie face-down on the floor; he threw the office telephone to the floor, then used her keys to unlock the door and left.
While the robbery was taking place, Defendant's accomplice, Joseph Louis, engaged the store cashier, Sherry Polk, in conversation. He kept looking towards the office and when Defendant left the store, Mr. Louis told Ms. Polk "bye" and left with Defendant. Ms. Polk then *485 walked to the office and found Ms. Frith lying on the floor.
Approximately two weeks after the June 25, 1998 robbery, Defendant and Mr. Louis returned to the store just before closing. They bought fruit salad and left the store. After the men left, the employees locked the doors. One of the men, later identified as Defendant, returned, claiming he had left his wallet inside the store. Store personnel checked for the wallet but could not locate it. The man was not allowed back in the store, so he left.
On July 19, 1999, Ms. Frith returned to work from vacation. As closing time approached, she stood outside the office talking to her husband on the telephone. Defendant approached her from behind and told her to hang up. He then forced her to enter the office with him and fill a bag with cash. Again, he ordered her to lie face-down on the floor. Defendant smashed the office telephone and used Ms. Frith's keys to unlock the door and leave the office.
While Defendant confronted Ms. Frith in the office, Mr. Louis approached the cashier on duty, Velma Sigue, and told her not to be scared. Ms. Sigue followed his gaze in the direction of the office and saw Defendant holding a gun to Ms. Frith's head. After the two men left the store, Ms. Sigue walked to the office and found Ms. Frith lying face-down on the floor.
Essentially, the second robbery paralleled the first, except for one important factor. At the time of the first robbery, there was no video camera in the store office. Thereafter, a camera was installed and the events of the second robbery were recorded. The police released the video of the second robbery to news agencies, which resulted in a tip that Defendant was in Baton Rouge. After learning Defendant's name, the police used his driver's license photograph in a photograph line-up from which Ms. Frith identified Defendant's picture.
Defendant was arrested. His apartment and vehicle were searched pursuant to warrants. Subsequently, Ms. Frith and Ms. Sigue identified Defendant in physical line-ups. Ms. Polk identified another individual in a line-up, but was uncertain of the identification. The weapon used in the robberies was never found, and Defendant's fingerprints were never located at the store. However, fingerprints found at the store did match Mr. Louis' fingerprints. On August 8, 1998, Ms. Sigue spotted Mr. Louis at a bus station in Lafayette. The police were notified, and he was arrested. He initially denied involvement in the robberies, but then elected to cooperate with the State.

ERRORS PATENT
In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find there is one error patent.
The trial court erroneously informed Defendant that he had three years to file for post-conviction relief. Act 1262 of the 1999 Regular Legislative Session changed the time period for filing post-conviction relief to two years from the date the judgment of conviction and sentence becomes final. See La.Code Crim.P. art. 930.8. The amendment became effective August 15, 1999. Defendant was sentenced on August 31, 1999. Application of the amendment to defendants whose convictions and sentences become final after the effective date of the law has been held not to be an ex post facto application of the law. State ex rel. Glover v. State, 93-2330, 94-2101, 94-2197 (La.9/5/95); 660 So.2d 1189. Accordingly, the trial court is instructed to inform Defendant of the two-year prescriptive period provided for in La.Code Crim.P. art. 930.8 by "sending appropriate written notice to [him] within ten days of the rendition of this opinion and to file written proof that [he] received the notice in the record of the proceedings." State v. Fontenot, 616 So.2d 1353, *486 1359 (La.App. 3 Cir.), writ denied, 623 So.2d 1334 (La.1993).

SUFFICIENCY OF THE EVIDENCE
Defendant contests the sufficiency of the evidence. In evaluating the sufficiency of the evidence, the standard used by the appellate court is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of every element of the crime charged. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Nguyen, 95-1055 (La.App. 5 Cir. 3/26/96); 672 So.2d 988, writs denied, 96-1019 (La.10/4/96); 679 So.2d 1377, 96-2087 (La.10/7/96); 680 So.2d 639.
As noted by the defense, when a key issue at trial is whether the defendant was the perpetrator of the crime, "the state [is] required to negate any reasonable probability of misidentification in order to carry its burden of proof." State v. Long, 408 So.2d 1221, 1227 (La.1982). The Louisiana Supreme Court recently addressed this issue in State v. Bright, 98-398, pp. 22-23 (La.4/11/00); ___ So.2d ___, ___, 2000 WL 366295:
The fact-finder weighs the respective credibilities of the witnesses, and this court will generally not second-guess those determinations. State ex rel. Graffagnino v. King, 436 So.2d 559 (La. 1983). However, we are mindful that the touchstone of Jackson v. Virginia is rationality and that "irrational decisions to convict will be overturned, rational decisions to convict will be upheld, and the actual fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law." State v. Mussall, 523 So.2d at 1310.
Defendant was convicted of two counts of armed robbery, which La.R.S. 14:64(A) defines:
Armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon.
Defendant attacks the credibility of the State's witnesses and their identifications of him as the robber. Ms. Frith was confronted by the gun-wielding Defendant twice. She unequivocally identified him in a photographic line-up, a live line-up, and at trial. Ms. Sigue saw Defendant twice also: first, when he was locked out of the store and, second, when he returned to commit the second robbery. Mr. Louis appeared at trial and identified Defendant as his accomplice in the robberies.
Defense counsel argues the following factors weaken the identification of Defendant as the robber: 1) none of the fingerprints taken by police were identified as Defendant's, although a couple of them matched Mr. Louis's; 2) the weapon used in the robberies was never located; and 3) the ammunition clip that police recovered from Defendant's glove compartment appeared to be too large for the empty gun-box found in Defendant's apartment. Further, Ms. Frith's initial description of the robber after the first robbery incident was rather vague, and she described him as clean-shaven. Pictures of the second robbery show Defendant with facial hair. Additionally, under cross-examination, Ms. Frith insisted Defendant's gun was black, however, police testimony indicated she had initially stated it was black, but subsequently indicated the weapon was black and silver-colored.
These points do not seriously detract from the witnesses' credibility. Even considering her first description of him as vague, Ms. Frith saw Defendant on two occasions and identified him unequivocally in three different situations. Ms. Sigue also saw him twice and identified him as the robber. Mr. Louis identified Defendant as his accomplice. The jury viewed the videotape of the second robbery and *487 still pictures taken from the videotape and were able to compare these to Defendant in person at trial. This also allowed the jury to assess the credibility of the witnesses' identifications of Defendant.
We find the jury's credibility determination and conclusion that Defendant robbed Ms. Frith to be rational. Further, we find no reasonable probability of misidentification in this case. This assignment has no merit.

ADMISSION OF DEFENDANT'S STATEMENT
Defendant argues the trial court erred by allowing his statement to police to be admitted into evidence. He argues that he was not advised of his Miranda rights and that his remarks were not inculpatory. These arguments were initially presented to the trial court in a pre-trial hearing on July 7, 1999. After hearing testimony from the two officers who questioned Defendant after his arrest, the trial court ruled that he had been properly Mirandized and his statements were inculpatory and, therefore, admissible.
Detective James Aman and Major Robert Feller[1] both testified that Major Feller Mirandized Defendant before questioning him. Two factors stood as possible indications that the officers did not Mirandize Defendant. The "Advice of Rights" by the officers did not appear on the tape made of the interview, and Major Feller failed to fully complete the "Advice of Rights" form. He checked off some, but not all, of the boxes on the form. Major Feller testified that his failure to check off two of the rights listed on the form was merely an oversight. He also testified that the "Advice of Rights" did not appear on the tape due to a mistake. The officers were the only witnesses at the hearing, thus the Miranda issue turned on the trial court's credibility assessment of their testimony.
We find no error with the trial court's conclusion that Defendant was properly Mirandized before he made the statements at issue.
The defense argues that the statements classified by the State and ruled by the trial court as inculpatory were not inculpatory and goes on to argue that a "non-inculpatory" statement is inadmissible. The classification of a statement as "inculpatory" usually arises in the context of whether the statement at issue is admissible under La.Code Crim.P. art. 767, which requires that a confession or inculpatory statement be ruled admissible prior to reference thereto in opening statement, or La.Code Crim.P. art. 768, which requires that a defendant be notified in writing of the State's intent to use such statements at trial, when the defendant has not been granted pretrial discovery.
In State v. Neslo, 433 So.2d 73, 82-83 (La.1983) (emphasis added), the supreme court addressed the issue of whether a statement was inculpatory:
This court has held that a confession is a statement which admits the commission of a crime, while the inculpatory statement admits a fact, circumstances, or involvement which tend to establish guilt or from which guilt may be inferred. State v. Quimby, 419 So.2d 951, 956 (La.1982); State v. Brumfield, 329 So.2d 181, 187 (La.1976). The account of the defendant's statements given by Johnson does not demonstrate any criminal intent. Neither do the statements that "something had happened in the quarter" or that "someone had gotten killed" contain necessarily incriminating facts. However, the clear implication of Johnson's testimony, based on the defendant's statements, is that the defendant admitted involvement in the crime. The statements as presented show circumstances and involvement and are *488 inculpatory within the meaning of C.Cr.P. 768 and should have been excluded by the trial court for lack of notice.
Analyzing Defendants statements in light of Neslo, we find that the statements by Defendant were inculpatory. The transcript of the interrogation of Defendant reveals that he initially denied any involvement in the robberies. When the officers told him they had a photograph of him during the robbery, Defendant asked: "You have a picture of me? ... You do?" After the officers showed him the still photograph from the security video and explained that a video camera had been installed after the first robbery and that it was taping during the four and one-half minutes he was in the cashier's office during the second robbery, Defendant stated: "Detective, I work. I have a child." He then stated: "Cut it off."
Major Feller described Defendant's reaction to seeing his photograph: "he kind of slumped his head down, sit (sic) there for a minute, and then ... a few minutes after that he asked to cut the tape off." According to Major Feller, Defendant then asked to speak to the district attorney, indicating that he knew the officers could not make a deal with him.
Analyzing these statements in light of State v. Neslo, we find no error with the trial court's conclusion that the statements were inculpatory. Defendant's requests to cut off the tape and to speak to the district attorney regarding a deal, taken in the context of seeing the photograph of himself during the robbery is a "clear implication" of his involvement in the robberies.
For these reasons, this assignment has no merit.

EVIDENCE OF OTHER BAD ACTS
In his second assignment of error, Defendant contends that the lower court improperly admitted evidence of other bad acts, as proscribed by La.Code Evid. art. 404(B)(1)[2]. The focus of this argument is Ms. Sigue's and Mr. Louis' testimony regarding the incident in which Defendant and Mr. Louis returned to the store after the store was closed.
After Ms. Sigue recounted the events of the second robbery, the State asked if she had ever seen Defendant before. Defense counsel objected, and the court held a bench conference at which time State's counsel noted that he expected Mr. Louis "to corroborate her testimony that they went in that store before with an eye of possibly doing it again, but they were unable to do it because they got locked out."
The trial court allowed the testimony, ruling that it went to the key issue of identification. Ms. Sigue then testified that about a week before the July 19, 1999 robbery she saw Defendant and Mr. Louis at the store. According to her testimony, they went to the fruit section, got a container of watermelon and cantaloupe, then paid for it and left the store. It was time to lock the store. After the doors were locked, one of the men came back, knocked on the doors and said he had left his wallet; he was not allowed back into the store.
When Mr. Louis testified, the State asked him if he and Defendant had gone back to the grocery store within a couple of weeks of the first robbery. Defense counsel objected and another bench conference was held. During that conference, *489 the State noted that it had instructed Mr. Louis not to recount why they had returned to the store. Mr. Louis then testified. His testimony corroborated Ms. Sigue's testimony.
Defense counsel did not contemporaneously object to Mr. Louis' testimony as given. Instead, counsel stated, "I would just object to it if he said what the purpose was." Thus, this assignment is barred due to the lack of a contemporaneous objection. La.Code Crim.P. art. 841.
We find no error with the admission of this testimony.

PHOTOGRAPH OF LIVE LINE-UP
Defendant argues the trial court erred by allowing the State to introduce a photograph of the live line-up conducted at the New Iberia Parish Jail on July 28, 1998. Defense counsel objected, arguing the photograph was unduly prejudicial because it showed Defendant in a jail uniform in a jail setting. The State responded that the photograph had probative value because it showed the jury that there was no suggestiveness in the line-up identification process. The trial court admitted the photograph because a key issue in the trial was Defendant's identification.
As a part of its fact-finding and guilt determination function, a jury is entitled to the benefit of all of the evidence, including photographic evidence introduced during trial. State v. James, 339 So.2d 741 (La.1976). However, this is a general rule and is subject to exceptions. Photographs which are unduly prejudicial in nature are not admissible into evidence. The test for admissibility of gruesome photographs is whether their probative value outweighs any prejudicial effect. A trial court's ruling in this regard will be disturbed only if the prejudicial effect of the photographs clearly outweighs the probative value. Also, photographs which illustrate any fact, shed light upon any fact at issue in the case, or that are relevant to describe the person, place or thing depicted are generally admissible. State v. Boyer, 406 So.2d 143 (La.1981).
State v. Hampton, 96-608, p. 6 (La.App. 3 Cir. 12/11/96); 687 So.2d 505, 509-10, writ denied, 97-16 (La.5/9/97); 693 So.2d 766, (quoting State v. Breaux, 546 So.2d 1352, 1355 (La.App. 3 Cir.1989)).
While the issue here is not gruesome photographs as it was in Hampton, the test is the same. Identification was a key issue in this case, and the photograph was highly relevant as Defendant made every effort to call into question the credibility of the witnesses' identification of him. The photograph was shown to a jury when Defendant was on trial. The jury knew he had been arrested for armed robbery. The members of the jury would have known or expected Defendant to be dressed in a jail uniform in a jail at some point in time before the trial.
We find nothing in the photographs to be prejudicial to Defendant and, consequently, find no error with the trial court's admission of the photograph. This assignment lacks merit.

HABITUAL OFFENDER
In his fifth assignment, Defendant argues that the bill of information charging him as a habitual offender failed to specify that both underlying armed robbery convictions were to be enhanced. He asks that the sentences be vacated, and the case be remanded for re-sentencing. Citing the bill of information, the State argues that the bill contemplates that enhancement would apply to both robberies.
The relevant statute is La.R.S. 15:529.1. In State v. Donahue, 572 So.2d 255, 261 (La.App. 1 Cir.1990), the court considered the purpose of the habitual offender bill of information, stating:
A habitual offender bill of information does not charge a new crime but is only a method of increasing the punishment of second and subsequent felony offenses, State v. Walker, 416 So.2d 534, *490 536 (La.1982). It is essential that the prior conviction(s) be formally charged in order to sentence a defendant as a multiple offender. State v. Hingle, 242 La. 844, 139 So.2d 205, 206 (1961). The multiple offender indictment need only inform the accused of his previous felony conviction(s) within the time period set forth in LSA-R.S. 15:529.1. This satisfies the constitutional requirement that the accused shall be informed of the nature and cause of the accusation against him. State v. Bullock, 329 So.2d 733, 737 (La.1976); State v. Rowell, 306 So.2d 671, 675 (La.1975).
See also State v. Daniels, 628 So.2d 63 (La.App. 1 Cir.1993), writ denied, 94-3044 (La.11/15/96); 682 So.2d 752.
In habitual offender cases, the charges to be defended against are the prior convictions alleged. A defendant is unable to defend against the recent underlying offense(s) because the trial court has the right to take judicial notice of any prior proceeding in cases over which it presided. State v. Valentine, 397 So.2d 1299 (La.1981). While there is a prohibition against habitual offender enhancement of more than one conviction obtained the same day when the convictions arise out of a single criminal act or episode, there is no such prohibition against enhancement for more than one conviction obtained the same day when the convictions arise from the commission of multiple separate felonies. State ex rel Porter v. Butler, 573 So.2d 1106 (La.1991). Furthermore, La.R.S. 15:529.1 does not require that a habitual offender bill specify which underlying charge is being enhanced when the defendant has been convicted of multiple separate felonies on the same day.
We find no merit in this assignment.

EXCESSIVENESS OF SENTENCE
In his final assignment of error, Defendant contends he received excessive sentences. The 198-year term that he received on each count is the maximum prescribed by the applicable statutes. See La.R.S. 14:64 and 15:529.1. Noting that maximum sentences are normally reserved for the worst kinds of offenders or those who pose an unusual risk to society, Defendant argues that he is not the worst kind of offender. See, e.g., State v. Price, 95-997 (La.App. 1 Cir. 6/28/96); 677 So.2d 705. The trial judge has wide discretion in the imposition of sentence within the statutory limits; the relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. State v. Cook, 95-2784 (La.5/31/96); 674 So.2d 957, cert. denied, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).
At the sentencing hearing, the trial judge detailed his reasons for the sentence imposed. He considered the facts and testimony regarding Defendant's conviction for the two Delchamp's robberies and that "the evidence of Defendant's guilt was overwhelming." Defendant's pleas of no contest in the Nineteenth Judicial District, Parish of East Baton Rouge, to three counts of simple robbery which were apparently reduced charges were also considered. Consideration was also given to La. Code Crim.P. art. 894.1 and the manner in which the robberies were committed. They were violent and involved the use of a firearm. Defendant was particularly cruel to Ms. Frith, yelling at her and threatening to kill her while he had a laser-sighted weapon pointed at her. Not only did he endanger Ms. Frith's life; he endangered the lives of other employees and patrons of Delchamps. Ms. Frith was dramatically and drastically affected by these robberies. She can no longer work due to the disability caused by her experiences. This has affected her life and her husband's, as well as their marriage.
The trial judge concluded Defendant is in need of correctional treatment that can only be provided by a custodial environment, that Defendant would commit another crime if not confined, and that any lesser sentence would not be consistent with the seriousness of the crimes he has *491 committed. No mitigating factors were identified by the trial court or defense counsel.
The jurisprudence is replete with cases in which 198-year sentences have been approved for armed-robbery habitual offenders. See, e.g., State v. Gordon, 582 So.2d 285 (La.App. 1 Cir.1991); State v. Franklin, 519 So.2d 292 (La.App. 5 Cir. 1988); State v. Gordon, 477 So.2d 881 (La. App. 5 Cir.1985); State v. Donahue, 408 So.2d 1262 (La.1982); and State v. Jolla, 337 So.2d 197 (La.1976).
The sentence imposed herein is severe. However, Defendant's criminal history and the manner in which the robberies at Delchamps were committed justify the lengthy sentences imposed. We find no abuse by the trial court of its broad discretion. Specifically, we find that the sentences are not "grossly disproportionate" to the crimes committed. This assignment has no merit.

DECREE
Defendant's convictions, habitual offender adjudications, and sentences are affirmed. However, the trial court is directed to inform Defendant that pursuant to La.Code Crim.P. art. 930.8, he has two years from the date his judgments and sentences become final to apply for post-conviction relief. This notice should be in writing and sent to Defendant within ten days of the rendition of this opinion. Written proof of Defendant's receipt of the notice should be filed in the record of the proceedings.
AFFIRMED.
NOTES
[1] At the time of the interview, Major Feller was a captain. In the interim before the trial, he was promoted to major.
[2] B. Other crimes, wrongs, or acts. (1) Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding. (Emphasis added).